(No. 15209.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEO HILDEBRAND *et al.* Plaintiffs in Error.

*Opinion filed April 18, 1923.*

1. CRIMINAL LAW—*when Supreme Court will not set aside verdict—alibi.* The Supreme Court will not set aside a verdict of guilty as being contrary to the weight of the evidence unless it is clear that there is a reasonable doubt of the defendants' guilt, and where the case depends merely upon the credibility of witnesses on one side testifying to an alibi and on the other as to the identification of the defendants, the Supreme Court will not substitute its judgment for that of the jury unless it is clear that the jury have made a mistake or have acted from passion or prejudice.

2. SAME—*when a verdict is sufficient to convict defendants of robbery with a dangerous weapon.* Where it is charged in each count of an indictment for robbery that the defendants were armed with a dangerous weapon, to-wit, a revolver, a verdict finding the defendants guilty of robbery in manner and form as charged in the indictment is sufficient upon which to sentence them with the punishment provided for robbery with a dangerous weapon under the amendment of 1919; (Laws of 1919, p. 427;) and it is not necessary that a specific intent to kill or wound be alleged, proved or found. (*McKevitt* v. *People,* 208 Ill. 460, distinguished.)

WRIT OF ERROR to the Circuit Court of St. Clair county; the Hon. GEORGE A. CROW, Judge, presiding.

J. M. BANDY, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, HILMAR C. LINDAUER, State's Attorney, and FLOYD E. BRITTON, (LOUIS KLINGEL, and JAMES A. FARMER, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The Dupo State Savings Bank of Dupo, in St. Clair county, was robbed a few minutes after two o'clock in the afternoon of Friday, December 23, 1921, and $11,344.15 in money was taken by the robbers. The plaintiffs in error, Leo Hildebrand, Melvin Cramer, Peter McCann and Claude Bernero, together with Roy Damen, were indicted for the crime and upon trial the plaintiffs in error were convicted. They have sued out a writ of error to reverse the conviction. Damen was acquitted.

It is contended that the evidence does not support the verdict. Dupo is a village of about 1400 inhabitants, situated about seven miles south of East St. Louis. Large switching yards of the Missouri Pacific and Iron Mountain railroads are located there and the banks have to arrange for the cashing of checks for the railroad men. December 23 was the day before pay-day, and the president of the bank, in accordance with his custom, had been to East St. Louis in the forenoon of that day and arranged for money to cash the checks on pay-day. He brought back the money from an East St. Louis bank in an automobile. The money was in bills of the denominations of $5, $10 and $20 and there were some silver and pennies. The bills were put up in packages of $500 each, fastened with pink papers in strips one inch wide and of whatever length was necessary to go round the bills across the center of them, fastened with a pin, with the amount of the package ($500) stamped on the paper. The silver half-dollars and quarter-dollars were in twenty-dollar rolls and the pennies were in canvas bags, tied up. The bank was situated on the southeast cor-

307—35

ner of Lindemann avenue, running east and west, and Second street, running north and south. It fronted twenty-eight feet on Second street and extended back forty-four feet on Lindemann avenue. The entrance was at the northwest corner of the building, where there was a landing about six feet square, which was reached by two steps from each street. Double swinging glass doors opened into the bank. The bank fixtures, which separated the portion of the room accessible to the public from that portion in which the bank's business was transacted by its officers and employees, extended from the south wall about nine feet back of the front, north to a point about six feet south of the north wall, and then turning with a curve to the east, extended to a point twenty-eight feet east of the west wall, leaving a corridor some six feet wide on the north side of the room. The portion of the room east of that point was used as a directors' room, except the south ten feet of that portion, which was occupied by the vault. The base of the fixtures consisted of an oak counter, which was surmounted by a metal screen, the whole being about eight feet high. At the east end of the six-foot corridor there was a door opening into the directors' room and also one opening into the banking compartment, from which there was also a door into the directors' room. There was a window in the metal screen through which business was transacted, at the turn of the fixtures opposite the door. At the time of the robbery George C. Lindemann, the president of the bank, and Hilda Breidecker, the assistant cashier, were seated at a table in the directors' room with their backs to the door opening into the banking compartment. Albert Metzger, the cashier, stood near the window which has been mentioned, facing the door. No one else was in the bank. Four men with revolvers in their hands, caps pulled down over their eyes, handkerchiefs over the lower part of their faces, ordered Metzger to hold up his hands. He did not see them when they entered the bank but first saw them

when they stood before his window. One of the men·then climbed over the partition to the east of Metzger, and the noise he made attracted the attention of Lindemann and Miss Breidecker, who came into the banking compartment through the door from the directors' room and were met by the man who had climbed over the partition, with the command to hold up their hands. He had a handkerchief over his face and a revolver in his hand and ordered all three to lie down on their faces. Another man similarly disguised and armed was seated in a chair by a desk. How he got there does not appear from the evidence. The first man said to Lindemann, "You are the one to open the safe; come on and open it," and pushed him. Lindemann went into the vault and opened the safe. He then came out of the vault and lay down again on his face. The men gathered up the money and put it in a sack. The bank was equipped with a siren, and Metzger with his foot found the button and pressed it. During all this time a Grant Six automobile had been standing in front of the bank or a little south of it, with its engine running. When this alarm sounded the car moved up in front of the bank and the chauffeur sounded the horn three times. The robbers came out of the bank, got into the automobile and went north on Second street. A few minutes later they were seen going at a rate of forty or forty-five miles an hour on the road to St. Louis. Oscar E. Schellhardt had just come out of a doctor's office on the west side of Second street, a short distance north of Lindemann avenue. He saw the men come out of the bank and get into the car. When the robbers left, Metzger went out after them. They were then nearly a block away. He asked Schellhardt to follow them, and the two did so in Schellhardt's Ford car, but they were not able to keep up. They followed them about two miles, and finding they were not able to overtake them, stopped for Metzger to telephone. The robbers' car disappeared.

The next morning it was found standing at Eighteenth and Market streets, in East St. Louis. Policemen took it to police headquarters, where it has been ever since and nobody has claimed it. In the car was a band of pink paper such as that which was around the packages of currency which were taken, some paper such as coin is wrapped in by banks, a 38-caliber Smith & Wesson revolver with the number filed off, and a sawed-off single-barrel shotgun with the number filed off. This account of the robbery was proved by the evidence introduced by the State.

The plaintiffs in error insist that the evidence does not sustain the verdict because it is not sufficient to identify them as the persons who committed the robbery and because the evidence of the defense establishes an alibi for each of the plaintiffs in error. These are the two questions of fact in the case.

Lindemann was unable to identify any of the robbers. He saw only the two who were inside the bank fixtures. He described the one who held the revolver and ordered him to hold up his hands and who afterward compelled him to open the safe, as a very tall man with a dark complexion. Both he and the man in the chair had on caps and cravenettes,—yellow raincoats. Miss Breidecker testified that this same man who met her and Lindemann at the door was a large man, who had heavy, dark eyebrows and wore a cravenette. She could see his eyes and eyebrows but not the lower part of his face. The other man, who was seated, also wore a cravenette. He was short and heavy. He was built like Bernero, and she thought he was Bernero because of his build. She had seen a picture of Bernero and had covered the lower part of the face of the picture and it looked like him. She was lying in such a position that she could see his eyes but not the lower part of his face. She also saw a third man and saw his handkerchief drop from his face twice. He was outside the fixtures which divided the banking room, and she could

not see his face and did not identify anyone but Bernero. Metzger testified that he could not identify the man that climbed over the fixtures. He was a very good-sized man, and while Metzger was lying on the floor he heard the man go to the drawers and take out the money and one man go into the vault and afterwards come out and make Lindemann open the safe. He said there were three men in the cage, and one of the robbers was right close to him,—he could feel him. He did not know how many there were. He had an opportunity to see one of the robbers. When he first saw them standing before his window they had handkerchiefs over their faces and one of them seemed to have trouble to keep his up. It fell down and he had to grab it and put it back. Metzger got a very good look at him while his handkerchief was down, and he identified him at the trial as the plaintiff in error McCann.

Two or three customers came into the bank while the robbery was going on, but they were also forced to lie down on the floor on their faces and were unable to identify any of the robbers. One of them, D. H. Henson, testified that as he opened the door and walked in, a man standing there with a gun pushed him around a little before he got inside the door and told him to "Stick them up!" and made him lie down on the floor. He said this man was a short fellow with a dark complexion, and that the plaintiff in error Hildebrand resembled him in color, complexion, height and all.

Schellhardt, who followed the robbers with Metzger in his car, testified that after the siren sounded and the driver of the car near the bank drove up and tooted his horn the men came out of the bank and got in the car. The driver of the car he said was Damen. The first man to get in the car had a handkerchief around his neck and a gun in his right hand and a sack in his left hand, and Schellhardt said he was Bernero; that the second man had a revolver still bigger than the first one and a bigger bag, but he was

not among those on trial; and the third had no gun or had it in his pocket, and that he was McCann. He said there were more than three men who got in the machine, but he did not know whether it was one or two more.

H. Pullen, an operator for the Missouri Pacific, lived in Dupo a block or two east of the bank and at the time of the robbery was returning along Lindemann avenue from a grocery on First street when the car which has been mentioned came along slowly, running close to him on the north side of the street, driven by the defendant Damen. There was one other man in the car, which was within ten feet of Pullen, and he walked thirty feet alongside the car. Then the car ran across the street close to the bank and backed around the corner on Second street and stood there, close to the sidewalk, facing north. Pullen said that while the car was there the other four defendants, Hildebrand, McCann, Bernero and Cramer, came along from the east. He was walking along slowly and thought they were some people from Columbia, but as they got closer to him he noticed them and had never seen them before. He walked slowly and got pretty close to them,—just across the street,—then they went on, and when he turned his head and looked back they were just going into the bank. The man at the wheel of the car just sat in the car with the engine running. When the car drove up in front of the bank a man got out whom they had not got on trial. There were six altogether. This man they did not get was a big man,—he would judge him to be six feet,—square shoulders and his face was dark complexioned. He did not know any of them. It was the first time he had ever seen them. The defendants on trial,—all five of them,—were in that bunch.

Lulu LaCroix, a school girl seventeen years old, testified that on the day of the robbery as she came home from school at noon she met this Grant Six car. She was going north from the school house to her home and the car was going south on First street. It passed her as she was go-

ing into the door of her home, which was on the east side of First street, north of Lindemann avenue. She did not notice how many men were in the car and could only see the men in front. This was five minutes to 12:00. Afterwards, as she was going to school, about 12:30 or 12:40, she passed this car about two blocks south of her home, coming north on First street. She was on the west side of the street and they were going north on the same side, driving slowly. They stopped her and one of the men got out and asked her where the bank was and who was the owner of the bank. This man she testified looked like Hildebrand, and that she would say he was the man. When he asked who was the owner of the bank and where the bank was she told him she did not know. A man seated in the back of the machine close to the edge of the seat looked out and said, "You know where the bank is and who is the owner; speak up," and she told him she didn't know. The man in the back of the machine had on a man's coat and a black skirt,—a woman's skirt. He had on a man's hat,—a soft hat. Over that he had a heavy veil, which came around and tied around the brim. She told them to look through and they could see the bank. The bank was in sight from where they were and she showed them where it was. She did not tell them the owner of the bank. They changed seats. The one that was driving got out and got in the back seat and the man behind got in the front seat. She said he was Bernero. He had on a skirt and wore a man's shoes. She noticed the way he walked. He was pigeon-toed and tried to walk straight,—that is, his toes were turned in. Bernero was the man who told her to speak up. The other man was McCann. He was driving the machine when they stopped. He got out of the machine and got in the back seat. He got out on the west side,— the side she was on. He said nothing to her. When they started again Bernero was at the wheel,—the man with the skirt. Hildebrand got back in the automobile in the back

seat. At that time nobody else was in the car,—just those three. It was raining that day and the machine was a little muddy.

The evidence, if believed, is sufficient to establish the identity of the plaintiffs in ·error as robbers of the bank. The defendants denied that they were in Dupo or had anything to do with the robbery, and they introduced the testimony of witnesses for the purpose of establishing their defense. Damen lived in St. Louis and the jury found him not guilty, so that the testimony concerning his alibi need not be considered. Hildebrand, Cramer and McCann claimed that on the afternoon of the robbery, from twelve o'clock to five, they were in the Jefferson Grill, in East St. Louis, Hildebrand and McCann preparing, cooking and serving a dinner of chicken and dumplings and Cramer as a guest or visitor at the grill. The evidence introduced to establish this claim was the testimony of a large number of witnesses who were also present either a part or all of the afternoon at the grill, most of whom partook of the dinner. There were discrepancies as to the time when the dinner was prepared, the time occupied in its preparation, the time when the serving of it began and the time when the festivities were over, but the evidence, if true, made it impossible for defendants Hildebrand, Cramer and McCann to have been present at Dupo at the time of the robbery.

The Jefferson Grill is characterized by the witnesses sometimes as a "soft drink parlor," sometimes as a "saloon." The attendant who waited on the customers called it a soft drink parlor and said he was the bar-tender and that he was selling whisky, and that is the softest drink that is mentioned in the testimony, except that Bernero drank soda. The testimony contains a description of the occurrences at this parlor both on Friday afternoon and on Saturday night, which was Christmas eve, when several of the witnesses and parties in this proceeding were present a part or all the time from eight o'clock in the evening un-

til 4:30 in the morning, and the soft drink parlor was noth-ing different from the disorderly all-night saloon of the days before prohibition. Most of the witnesses to estab-lish the alibi of these three plaintiffs in error were habitues of this parlor, who testified that they were accustomed to visit it daily or oftener, spending much time in these visits. If their testimony was true the plaintiffs in error were not guilty of this crime, but the jury were not bound to accept it as absolutely true without weighing it.

Bernero was the proprietor of the Federal Bar,—an-other saloon, called sometimes a soft drink parlor,—not far from the Jefferson Grill. His alibi was that he had a car in a garage undergoing repairs, which were promised to be completed by eleven o'clock on the morning of December 23. They were not completed until late in the afternoon, and the testimony of a number of witnesses was introduced to prove that Bernero was at the garage all afternoon, except for brief absences of a few moments. The credence to be given to this testimony was also a question for the jury.

It was peculiarly the province of the jury in this case to determine the credibility of the witnesses and the weight which should be given to their testimony. The verdict in-dicates that the jury exercised discrimination in perform-ing this duty. The witnesses by whom Damen sought to prove his alibi seem to have been deemed by the jury suffi-ciently worthy of credit to raise a reasonable doubt as to whether Damen was the man who drove the machine, and they found him not guilty. The witnesses by whom it was sought to establish the alibis of the other defendants do not seem to have gained with the jury the credit given to Damen's witnesses. There were circumstances in the case which were, to say the least, entitled to consideration in de-termining whether the latter set of witnesses were entitled to as much credit as the former. That is a situation in which the law regards the judgment of the jury as entitled to special weight. This court will not set aside a verdict

of guilty as being contrary to the weight of the evidence unless from a candid and impartial consideration of all the evidence it is clear that there is a reasonable doubt of the defendant's guilt. Where the case depends merely upon the credibility of witnesses, the court will not substitute its judgment for that of the jury unless it is clear that the jury have made a mistake or have acted from passion or prejudice. There is no indication that the verdict was the result of passion or prejudice on the part of the jury. On the contrary, they seem to have acted with judgment, and we cannot say that they have made any mistake. In regard to the identification of the defendants, Pullen had a good opportunity to observe all the defendants and he identified them all. Bernero is further identified by Miss Breidecker and Lulu LaCroix. McCann is identified besides by Metzger and Lulu LaCroix. Hildebrand was also identified by Lulu LaCroix and partially by Henson. The large man described by Lindemann and Miss Breidecker as having met them when they came out of the directors' room is also mentioned by Schellhardt as the second man who came out of the bank but was not among those on trial. Pullen also mentioned him as the man who got out of the car when it was driven up to the bank but said he was not among those on trial. Here, also, the jury had an opportunity to see the witnesses, to judge of their character from their action on the witness stand and their manner of testifying, to form an opinion as to their fairness, their opportunity for observation, the accuracy of their observation, the clearness of their recollection, and their bias, if any, and we cannot say that the verdict is not justified by the evidence.

The rulings of the court on questions of evidence objected to at the trial were manifestly correct and do not require discussion, and the same is true in regard to the instructions. The instruction on circumstantial evidence was properly given, and the ninth instruction did not single out Pullen's testimony for special comment.

It was charged in each count of the indictment that the defendants, at the time and place of the commission of the crime, were armed with a dangerous weapon, to-wit, a revolver. The jury found each of the plaintiffs in error guilty of robbery in manner and form as charged in the indictment. They were sentenced to confinement for a term of years not less than ten and until discharged according to law. It is insisted that the court erred in this sentence; that the jury found the plaintiffs in error guilty only of the crime of robbery, and that the sentence should have been for a term of years not less than three nor more than twenty. It is argued that inasmuch as the jury did not specifically find the plaintiffs in error were armed with dangerous weapons the verdict merely finds them guilty of robbery, and they cite in support of this contention *McKevitt v. People* 208 Ill. 460. It was held in that case that the verdict, "guilty in manner and form as charged in the indictment," did not include a finding of the specific intent with which it was charged the defendant was animated while armed with the revolver. The statute under which the defendant in that case was convicted of robbery provided that if the person convicted was armed with a dangerous weapon, with intent, if resisted, to kill or maim the victim, he should be subject to the greater penalty. In 1919 this statute was amended so as to provide that if the defendant is armed with a dangerous weapon he shall be imprisoned in the penitentiary for any term of years not less than ten or for life. (Laws of 1919, p. 427.) No question of intent is involved. It is not required to be charged or proved. The mere fact of committing a robbery while armed with a dangerous weapon incurs the liability to the higher punishment.

The judgment will be affirmed.     *Judgment affirmed.*